```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

   HOWARD BERGER CO., LLC,
                                       1:14-cv-06592-NLH-AMD
              Plaintiff,
                                       **OPINION**
        v.

   LIBERTY MUTUAL FIRE
   INSURANCE,

              Defendant.

**APPEARANCES**:

KIMBERLY PELKEY SDEO
PAUL J. MASELLI
SHAWN DAVID EDWARDS
MASELLI WARREN PC
600 ALEXANDER ROAD
PRINCETON, NJ 08540

JOSHUA L. MALLIN
WEG AND MYERS, P.C.
FEDERAL PLAZA
52 DUANE STREET, SECOND FLOOR
NEW YORK, NEW YORK 10007

     On behalf of Plaintiff

CHRISTOPHER S. FINAZZO
FINAZZO COSSOLINI O'LEARY MEOLA & HAGER, LLC
67 EAST PARK PLACE
SUITE 901
MORRISTOWN, NJ 07960

     On behalf of Defendant

**HILLMAN, District Judge**

   This matter concerns whether an electrical outage at Plaintiff's business caused by Superstorm Sandy is covered under an insurance policy issued by Defendant. Presently before the

Court is the motion of Defendant for summary judgment on Plaintiff's claim that Defendant breached the parties' insurance contract by not indemnifying Plaintiff for its covered losses. For the reasons expressed below, Defendant's motion will be granted.

**BACKGROUND**

Defendant Liberty Mutual Fire Insurance Company issued an All Risk Policy of Insurance, effective August 1, 2012 through August 1, 2013, to Plaintiff Howard Berger Co., LCC,[1] and that policy was in effect on October 29, 2012 when Superstorm Sandy impacted the Cranbury, New Jersey area where Plaintiff is located. The storm caused Plaintiff to be without electrical power, supplied by Jersey Central Power & Light Company, from October 29, 2012 until November 4, 2012.

Electricity is produced at the electric company's generating plant, which transmits high-voltage electric power downstream through transmission lines to transmission substations and then to distribution substations that connect the electricity to customers. The Cranbury substation delivers electricity to Plaintiff on Circuit 4783. The Cranbury

---

[1] Plaintiff develops, markets and distributes security and builder's hardware, plumbing products, paint applicators and home environment products to leading retailers, discount stores, home centers, wholesalers, drug and food chains, catalog companies, municipalities, and hardware stores worldwide.

2

substation receives electricity from the D82 transmission line. The D82 transmission line is supported by utility poles, including a 65' wooden pole which broke as a result of Sandy's strong winds. That failure of the D82 transmission line caused the Cranbury substation to de-energize, and become unable to provide electricity to Circuit 4783 which supplied Plaintiff with its electricity. The distribution line that directly provided electricity to Plaintiff was also impacted by the storm.

As a result, Plaintiff claims that it suffered business income losses in excess of $1,900,000.00. Plaintiff submitted a claim to Defendant detailing its losses and costs associated with the damages it suffered, but Defendant denied Plaintiff's claim on the basis that the electric service was interrupted due to the failure of overhead transmission and distribution lines, which is a non-covered cause of loss of utilities under the policy.

Plaintiff filed a one-count breach of contact complaint against Defendant, claiming that its damages are covered losses under the policy. Defendant has moved for summary judgment in its favor, taking the same position as its claim denial. Plaintiff has opposed Defendant's motion.

**DISCUSSION**

A.   **Subject matter jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  The citizenship of the parties is as follows: Plaintiff's sole member is also an LLC, Main, LLC ("Main").  Main's members are four corporations and an LLC, Walker Lake Holdings, LLC.  Accounting for each of the members of the sole member of Plaintiff LLC, including the corporations and the members of Walker Lake, Plaintiff is a citizen of New York, New Jersey, Delaware, and Connecticut. (Docket No. 45).  Defendant is a corporation duly organized and existing under and by virtue of the laws of Wisconsin, having its principal place of business in Massachusetts.  (Id.)

B.   **Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

4

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.

5

2001).

**C. Analysis**

The Third Circuit has summarized New Jersey law governing the interpretation of insurance contracts:

> Generally, "when interpreting an insurance policy, courts should give the policy's words their plain, ordinary meaning." Nav-Its, Inc. v. Selective Ins. Co. of Am., 183 N.J. 110, 869 A.2d 929, 933 (2005) (internal quotation marks and citation omitted). "If the policy language is clear, the policy should be interpreted as written, [but][i]f the policy is ambiguous, the policy will be construed in favor of the insured." Id. (internal citations omitted). Exclusions in an insurance policy should be narrowly construed. Id. at 934 (citing Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 698 A.2d 9, 16 (1997)). The insurer has the burden of bringing the claim within the exclusion. Princeton Ins., 698 A.2d at 16-17. Nonetheless, "exclusions are presumptively valid and will be given effect if 'specific, plain, clear, prominent, and not contrary to public policy.'" Id. at 17 (quoting Doto v. Russo, 140 N.J. 544, 659 A.2d 1371, 1378 (1995)); see also Am. Motorists Ins. Co. v. L-C -A Sales Co., 155 N.J. 29, 713 A.2d 1007, 1013-14 (1998) (finding that a policy exclusion precluded coverage because it was "clear and unambiguous" and not contrary to public policy). New Jersey courts also "endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured." See Nav-Its, 869 A.2d at 934 (internal quotation marks and citation omitted). The New Jersey Supreme Court has "recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, and in exceptional circumstances, when the literal meaning of the policy is plain." See id. (internal citations omitted).

Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231, 236 (3d Cir. 2006).

Thus, the starting point for the analysis of Plaintiff's breach of contract claim is the relevant policy language.

6

C. If coverage for loss of **business income** is provided as shown in **B.** Coverages of the DECLARATIONS, Form RM1000, we will pay for:

1. The actual loss of **business income you** incur during a **period of restoration** resulting from damage from **a peril insured against** to the type of property covered by this policy at a **covered location**.

\* \* \*

8. We will not pay for:
**a.** Any loss during any idle period. Idle period includes, but is not limited to, any period when production, operation or service would cease or be prevented due to:
**(1)** physical damage not insured under this policy on or away from the **covered location**;
**(2)** planned or rescheduled shutdown or maintenance;
**(3)** strikes or other work stoppage; or
**(4)** any reason other than a **covered loss**

**A. GROUP A EXCLUSIONS**
**We** will not pay for loss or damage caused by or resulting from any of the following, regardless of any other cause or event, including a **peril insured against**, that contributes to the loss at the same time or in any other sequence:
\* \* \*
**9.** Interference with or interruption of any public or private utility or any entity providing electrical, heating, air conditioning, refrigeration, telecommunication, steam, water, sewer or fuel service or any other service, if the failure occurs away from the **covered location.**
If a **covered loss** ensues, **we** will pay for that loss.

**INTERRUPTION OF SERVICES COVERAGE EXTENSION, modifying**
EXTENSIONS OF COVERAGE, Form RM1002 EXCLUSIONS, Form RM1003

**1. We** will pay for physical loss or damage to **covered property**, loss of **business income** and **extra expense** resulting from an interruption of the electrical, heating, air conditioning, refrigeration, telecommunication, steam, water, sewer or fuel service to a location shown on the Schedule of this endorsement, but only if the interruption of service results:
**A.** From physical damage by a **peril insured against**;
**B.** Away from a location shown on the Schedule of this endorsement;
**C.** To the following, if marked with an "X", that directly supply service to the location shown on the Schedule of this endorsement and are either owned, managed or controlled by a company with a contract to supply these services to that location, or are located within one (1) mile of that location:
**(1)** (X) Any electrical generating plant, substation, power switching station, transformer, gas compressor station, telephone switching facility, water or sewer treatment plant or any other plant or facility responsible for providing services specified in **1.** above;
**(2)** (X) Transmission and distribution lines, connections or supply pipes which furnish electricity, steam, gas, refrigeration, telecommunication, water or sewer (other than overhead transmission and distribution lines);
**(3)** ( ) Overhead transmission and distribution lines.

> **2. We** will not pay for any physical loss or damage to **covered property**, loss of **business income** or **extra expense** due to any interruption of service from:
> **A.** A satellite, regardless of cause; or
> **B.** The operation of any breaker, switch, device or system designed to preserve or protect any property or system integrity; or
> **C.** Any misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting, cleaning, or the performance of maintenance.

```
(Docket No. 32-1 at 12-14.)

     Defendant argues that the unchecked box for "(3) ( )

Overhead transmission and distribution lines" in the

INTERRUPTION OF SERVICES COVERAGE EXTENSION section precludes

coverage for loss of business income due to an interruption of

Plaintiff's electrical service.  The basis for this

determination is that the cause of Plaintiff's outage was due to

damage to the overhead distribution line that directly supplied

power to Plaintiff, or damage to the wooden pole which is part

of the overhead transmission line that permitted wires to become

dislocated, resulting in a fault that caused a breaker upstream

to de-energize the transmission line.  Defendant argues that

damages arising from either cause are not covered because

Plaintiff did not elect to purchase coverage for physical damage

to "overhead transmission and distribution lines."²

     In response, Plaintiff argues that the damage to the pole

supporting the transmission line caused the power outage, and
```

---

² Defendant also argues that Plaintiff's claim is not covered under the "Idle Period Clause."  The Court does not need to address that argument.

8

that the pole can be considered a "plant," which is covered under "(1) (X) Any electrical generating plant . . . or any other plant or facility responsible for providing the services . . . ." Plaintiff has provided an expert to support its position that damage to the D82 transmission line pole caused Plaintiff's power outage. Plaintiff's expert also views the "plant utility pole" to be "any other plant or facility responsible for providing the services." The expert takes this view because in the electrical industry, the term "plant" is broad and encompasses substations, transformers, circuit breakers, structures, and supporting poles, which provide a critical function as part of the system that provides electrical power service.

The Court accepts for the purposes of Defendant's motion that the cause of Plaintiff's power outage was the damaged D82 transmission line pole, as Plaintiff's expert determined. The Court also accepts Plaintiff's expert's view that the term "plant" is used broadly in the industry and can encompass many components of the electric supply system. Even accepting these views as true, the Court must interpret the insurance policy as a matter of law in a manner that comports with the literal meaning of the policy language.[3] When doing so, the Court finds

---

[3] See <u>Boddy v. Cigna Property & Cas. Companies</u>, 760 A.2d 823, 828 (N.J. Super. Ct. App. Div. 2000) ("It is well-established that

that Plaintiff's argument that the utility pole supporting the transmission line constitutes an "electrical generating plant . . . or any other plant" strains the policy beyond its plain and ordinary meaning.

An "overhead" electric power line of a certain length requires support to ensure that the line remains over-head.[4] It cannot float in the air like a magic carpet. The wooden pole supporting the D82 transmission line serves as that support.[5] Even accepting that the pole functions more than simply a support girder and provides a critical part of the system that provides electrical power, it cannot be considered a "plant" under the parties' insurance policy. If the pole were considered to be a plant, then all overhead transmission lines supported by similar poles would subsume the insurance policy's

---

expert witnesses simply may not render opinions on matters which involve a question of the law . . . [O]nce the trial court correctly determined that the interpretation of the contract language was a legal matter, [the court] was obligated to disregard the expert's opinion concerning its interpretation." (internal quotations and citations omitted)).

[4] See, e.g., N.J.A.C. 16:25-10.3(c), Location and alignment of overhead power and communication lines ("The distance between utility poles should be the longest feasible span length consistent with geometric and design line loading considerations.").

[5] See N.J.A.C. 16:25-2.1, Utility Accommodation, Definitions ("'Wooden pole' means the stem of a tree which has the proper natural characteristics to meet the engineering and design standards to support a utility line; and has been harvested, shaped, treated, and certified to meet that need.").

specific carve-out of coverage for "overhead transmission and distribution lines."

Moreover, classifying a wooden pole to be a "plant" would render the definition of a "transmission line" nonsensical. The New Jersey Administrative Code defines "transmission line" as:

> "Transmission line" means an electrical line, wire, or cable, (including the supporting structures) and appurtenant facilities that transmits electricity from a generating plant to electric substations or switching stations. An electric transmission line usually has a rating exceeding 69 kilovolts.

N.J.A.C. 14:5-1.2, Board of Public Utilities, Electric Service, Definitions. The supporting structure – the wooden pole – is part of a line that transmits electricity from a generating plant to a substation or switching station. It would not make any sense to interpret the definition of "transmission line" to read that a "plant" transmits electricity from a plant. The same interpretation holds true for the terms in the insurance policy.

Plaintiff argues that an insured would not understand the technical definitions provided by the N.J. Administrative Code when reading the insurance policy, and, consequently, such definitions should not be considered in interpreting the policy language. In that same vein, however, an insured would also not understand that a wooden pole can also constitute a "plant" as articulated by Plaintiff's expert.

Returning to the plain language of the policy, it is clear that the insured had three options for covering its loss of business income and extra expenses resulting from an interruption of the electrical service: physical damage to (1) "Any electrical generating plant, substation, power switching station, transformer . . . or any other plant or facility responsible for providing services . . ."; (2) "Transmission and distribution lines, connections or supply pipes which furnish electricity . . . other than overhead transmission and distribution lines"; and (3) "Overhead transmission and distribution lines."  Plaintiff chose the first two options.  Plaintiff's damages were caused by the third option it did not select.

Although insurance policies should be construed in favor of the insured, courts "'should not write for the insured a better policy of insurance than the one purchased.'" Boddy v. Cigna Property & Cas. Companies, 760 A.2d 823, 828 (N.J. Super. Ct. App. Div. 2000) (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989)).  Further, although courts "should not ignore an exclusion's clear meaning, if there is another fair interpretation, the court must construe the insurance policy in favor of coverage and against the insurer, adopting the interpretation supporting coverage." Id. (citation omitted).  This does not mean, however, "that any far-

fetched interpretation of a policy will be sufficient to create an ambiguity requiring coverage." Id. (citation omitted).

Here, the classification of the wooden pole that supported the D82 transmission line as a "plant" rather than an "overhead transmission line" is far-fetched based on the plain language of the insurance policy. Accordingly, because Plaintiff's damages were caused by an event excluded from coverage, Plaintiff is not entitled to indemnification of those losses under the parties' insurance contract.

## **CONCLUSION**

For the reasons expressed above, Defendant's motion for summary judgment in its favor on Plaintiff's breach of contract claim must be granted. An appropriate Order will be entered.


Date: May 23, 2017              s/ Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.